Case number 22-3573. Mark Changizi et al. v. Department of Health and Human Services et al. Argument not to exceed 15 minutes per side. Mr. Vecchione, you may proceed for the appellant. May it please the Court, John J. Vecchione for the New Civil Liberties Alliance. For the appellants, Changizi, Sanger, and Coatsen, I would like to reserve three minutes for rebuttal. Three minutes? Three minutes. Very well. This case is a simple one, or it should be. Set aside the controversial issues about COVID-19, pandemic, about vaccination, about masking, all of those things. The casebook that we're here to discuss greatly tightens the pleading standards that have traditionally been used here and throughout the country. It shuts the door to millions of those affected by government attempts to abridge their rights to free speech in the modern public square. This complaint was well pled with allegations that, in other contexts, have allowed cases to go forward because they have pled that the government's actions are the true source of what happened to the plaintiffs. What's the closest authority, would you say, out there to support your case? I think the Schlissel case is very good, Your Honor. I believe that Speech First v. Schlissel 939 F3rd 756 is close to this. And that's putting aside the Louisiana case, Missouri v. Biden, which is similar. But as far as here in the- Court of Appeals case. Yes, exactly. And so I think Schlissel is very close to this because you have a situation where the allegations were that there, the speech was just chilled. Nothing had happened to anyone. Here, my clients, something has happened to them. It's not arguable that they were thrown off Twitter or downgraded. Certainly not arguable, I want to stress, in the motion to dismiss and the pleadings, the allegations here are that that's what happened. So you have real injury. Then you have what did the government do. And it was far greater than what the university had done in Schlissel. I guess the problem with the injury, the biggest problem is the chronology that Twitter actually took adverse action against, I think you acknowledged in your complaint, they took some adverse action against your clients before the government did anything. And I'm glad you asked that because I'd like to address this. This is at the pleading stage. And if you look at paragraph 17 to 20 of the complaint, what it says there is yes, there was a very small moderation of some speech. And a 12-hour suspension is all we have in the pleadings. It's all we know about that ever happened before the government started pounding on these social media companies. So if you look at paragraph 17 to 20 of the complaint, it even says that it wasn't until after this that people got thrown off and started doing things the government didn't like. So whatever the timeline is, the delta in the effects of what Twitter was doing after the government started speaking, that delta, that increase in censorship would be enough to maintain the complaint. You do not have to say that everything was pristine and sunlit uplands before the government started speaking. What you say is that, and what is alleged here, is that once the government started speaking, the curtain came down and darkness resulted as far as free speech was concerned. Why is that enough to make it the government responsible? Public policy, I mean people speak on public policy. The government representatives speak on public policy. So unless there is coercion in the sense that do it or you will suffer, how is it government action to speak about policy and urge companies to take action? I would differ with your question. I don't think coercion is required in the cases. In some cases the government is just in cahoots with the companies. Here it could be in cahoots or it could be coercion, but the first... When you say in cahoots, if the company just has the same policy as the government, that would be in cahoots, but that wouldn't be actionable, would it be? It wouldn't be if they have the same policy and they wouldn't have done it if the government did something. But that's what I would call in cahoots. Oh, no, what I mean is that the company just didn't want the fight. Okay. All right? That's what I meant by... Their phrases use the word cajole, coerce, or command, and maybe what we're doing here is talking about what kind of spectrum is there and when do you cross a line. Yes, Your Honor, I would agree with that. I do think that there is cajoling and threats. The threat is, you know, it's a little bit like... I mean in this case, you know, whenever the government doesn't like what you're doing, there's conceivably a threat. I mean I'm old enough to remember Jack Kennedy didn't like the steel companies raising prices and he called the steel presidents in and had a talk with them. I don't think they changed their policies, but in any event, at least at that time nobody thought about that would be a lawsuit to make the president quit talking about our steel prices. No, and if there was only the president talking, that would be a different situation. What we have here is that... So the president's less powerful than his administration? He's not, but there have been some judicial protections. For instance, because the president... You don't enjoin the president normally, right? If I sued the president and I said enjoin the president, I believe I would get a frosty reception from this court. So what you do is you say, look, the president is saying these things and then what are the actions of the government of the... They've even called it a whole of government approach to stopping this type of talk. And so it wasn't just that the president talked or asked people to come in. Here you had something that I think a little of... I think it's the Taibbi case where someone went to purchase a gun, right? And an FBI agent came to the gun dealer and didn't say anything. He just came to inspect the place and the person who wanted to purchase the gun said, well, it was the government that did it. It wasn't just this guy doing this. But this court said, well, no, there's nothing else there. Well, there wasn't the president saying don't sell a gun to this guy or guys like him. There was not an absolute, something that never happened before. In this case, the Surgeon General sent out inquiries to where this misinformation is coming from, to all these social medias. We pled in the complaint, the Surgeon General doesn't even have that power. That's not his thing. It's just like the... But the inquiries weren't mandatory. I mean, the companies could have told the government to pound sand, couldn't they? Well, it's like those cases. It's like those cases. They're in the brief that the Surgeon General might not have the power to punish him, but the government does. And they know the president is saying what he's saying. They know that Jen Psaki, the president's spokesperson, is saying that we're going to have these companies do the right thing, which is pretty much a nice social media company you have there. Shame, if anything, could happen to it. And if you look at the case where they wanted drug testing for the railroads, and the railroads went ahead and did it and the government indemnified them. Well, we have an analogous situation here. Section 230 of the Telecommunication Act indemnifies or protects all these social media companies. And it protects them all from all kinds of suits. And one of the implicit threats here, all the time, is that they're going to remove that indemnification. But that means when you say remove, they're going to do it by changing the law. That is not the only way that these companies could be hurt. They could be hurt by pure executive action, by the Justice Department arguing, changing their view of what the 230 is, by every legal outfit in all of these places saying that 230 doesn't mean that, and it gives you less protection than was heretofore. Changing your position. I mean, for example, one administration can say, we're not going to support affirmative action anymore and you universities are going to be in all sorts of trouble if we change our position and go to the Supreme Court and try to get a different view. I mean, the question is, how do we draw this line? You know, FDR used to beat up on the newspapers rather vigorously and point out their evils. And certainly the government does have power to, you know, put a tariff on paper for the newspapers. The governments have power to affect private citizens. So, I mean, you can put things on each side, but give us your best shot at a definition of a line. I will say this. The Constitution says you chant a bridge, First Amendment speech. In this case, all of these companies, in your case, the government said, we don't like affirmative action anymore. And then they had the Surgeon General send an inquiry to all the schools in the country saying, well, who got in on affirmative action? And then the schools started throwing people out of school. Okay? We would think that was government action. And that is analogous to what happened here. The Department of Education asks people for all kinds of information. I wouldn't be surprised if an anti-affirmative action, the government would, well, they investigated Yale. They investigated Harvard, right? They brought a suit against Yale. And they are the ones responsible. That is like the Taibbi case where the FBI is always looking into these things. Department of Education is always doing this. And in your Schlissel case, that was the government in the form of a state university doing something directly, wasn't it? Well, whether they were doing something directly, they did have a policy. It was a policy. It was their policy. It wasn't them influencing, cajoling somebody else. That is true, Your Honor. But then again, they didn't do anything to anyone. And here we think they did do something to someone. So I think that this is the case where you've now got the Surgeon General involved in HHS. It's a little bit like Alabama Realtors where everyone says, what the heck are these guys doing here? Why are they here? Why are they engaging in something having to do with state eviction law, right? So what you have, you have a plus here because you have a bunch of actors who shouldn't be even acting in this playground. And they're doing it at the President's behest. And so the other thing that happened below that I think has to be overturned is this idea that you can't look at what the President and the President's spokesperson is saying when you are putting in a complaint. That has not been the standard that I've seen. We quote an Illinois case on page 17 of our brief where of course you say what the President is. But we know a lot of Supreme Court cases, New York v. Commerce. What the President had said mattered to what the census did because they're his agents, just like HHS and Becerra and Murphy. They're all his agents. So you can't say that the head of the organization saying what he wants to do, telling all of his flying monkeys to go forth and do these things, and then they do them, and then we say, oh, well, don't look behind the curtain. Don't look at... Do you have anything to say about the Ninth Circuit case? Or actually, it's not the circuit case. Yeah. O'Hanley v. Weber and Twitter. I think that differs on the facts here. I don't know that they had the timeline we had and I don't think they had the allegations of the increase. So that was... I thought you were going to ask me about the Schiff case where he just said things and they got thrown off. And I think O'Hanley is like that. That's all I can say about it. There was not a timeline of increased being pushed off Twitter.  What was it called? California had an Office of Election Cybersecurity. That was a state agency that was communicating with Twitter and flagging postings and then Twitter, more often than not, removed them. I would... You're not bound by that case, Your Honor, and also I think at least there, the responsibility of that agency was at least related to the topic. But that's all I can say about it right now and I see my time. Okay. Thank you. This is very minor. I'm not going to ding you too much, but since you raised Schissel, I was looking at Schissel for what you had to say about it and your reply brief has four pages cited, 6, 7, 12, and 13. I can't find anything on 12 and 13, so you might either correct that or direct me in the right location when we consider the case further. Thank you, Your Honor. Thank you. Good afternoon, Your Honor. Daniel Winnick for the government. In order for the federal courts to have jurisdiction, the injuries that plaintiffs allege must have been caused by HHS and must be redressable by an injunction against HHS. But Twitter disciplined plaintiffs under policies that it put in place before the series of governmental statements that plaintiffs describe as the Surgeon General's initiative. And Twitter is no longer enforcing any COVID misinformation policy even after what plaintiffs characterize as the imposition of coercive pressure. So when was the last time that something happened to these folks? I'm not sure, Your Honor, whether I can say what the last time that anything happened is. The last that's mentioned in the record or in the papers. Because there certainly were events, you know, well after the inception of the government's statements. Yes, Your Honor. And in the complaint, it's alleged that there were various sort of disciplinary measures imposed by Twitter after the series of statements alleged to constitute the Surgeon General's initiative. But what's relevant, I think, first of all, what's relevant based on the allegations in the complaint is that those were all actions taken under policies and importantly under an enforcement practice that Twitter adopted before any of the... But do you agree with their statement that there were more strenuous enforcements after the government's statements? No, and I think this is quite important. So their complaint alleges that the uptick in enforcement, the start of Twitter's more rigorous enforcement policy came in March 2021. That's two months before the first of the events alleged to constitute the Surgeon General's initiative. I agree this might be a harder case if their allegation was, well, they had this COVID misinformation policy but they didn't enforce it until these alleged governmental actions. But no, no, what their complaint pleads is Twitter had this policy and in March 2021 it started enforcing it with rigor. And then there was this series of statements that they alleged to constitute the Surgeon General's initiative. So just from the face of this complaint, there's no basis to conclude that any of the injuries that they complain about are the government's fault, that they were caused by the government, that they would be redressed by an injunction against the government. And I think that's even clearer now that, you know, again, they allege there has been this coercive pressure from the government. And lo and behold, today, Twitter isn't enforcing a COVID misinformation policy at all. Isn't that exactly what they allege? That before March 1st, they were not enforcing it? And then after... It's before March 2021, but March 2021 was before the events alleged to constitute the Surgeon General's initiative. So the pattern is 2020, Twitter adopts the policy. March 2021, Twitter starts enforcing it seriously. May 2021, you have Jen Psaki's statement about the President's views on misinformation. July 2021, you have the Surgeon General's advisory about misinformation. March 2022, you have the Surgeon General's request for information. So, again, the pattern they allege is that Twitter started enforcing its policy seriously before any of that happened. And what they say about this after we made this argument in our brief is they say, oh, well, who knows, maybe somebody talked to Twitter back in March. But as the district court said, that's pure speculation. They have absolutely no factual basis in the complaint or otherwise for suggesting that there must have been back-channel communications in March or January or February 2021 that caused Twitter to actually start enforcing this policy it had adopted in 2020. Just to address briefly the Tarani case, I think my co-counsel misdescribed the facts of that case. That's the one about the FBI agent going to the gun dealer's house after the plaintiff tried to buy a gun at a gun show. It wasn't that the agent just sort of visited and did nothing. What happened there was that the agent wanted to see what information Tarani had provided at the gun show, and he said, quote, we have a problem with the company he keeps. And he showed a photo of Tarani with another person of Middle Eastern descent. And with all of that, this court said Tarani's grievance is not with the FBI, it's with the gun dealer because there's no basis in the allegations to conclude that it was actually the FBI that caused the dealer's ultimate decision not to sell him the gun. Exactly the same is true on these facts. Is it your view that this is a bright line rule of the third party, or how would you put the line? You might put it in a different place than your adversaries, but is there a line if there's internal, suppose Discovery shows internal e-mails saying, well, I talked to Sally and we're in really big trouble if we don't ramp up our policy. Would that help? Would that be enough? So, Your Honor, I think there's basically two jurisdictional problems here. One is the chronology, and one is the level of sort of coercion, which merges with the merits. So to talk first about the chronology, I think this case is easy and doesn't present some of those hard line drawing questions because it's so clear from the face of the complaint that Twitter was acting under policies that it set before any of the allegedly coercive actions. The second jurisdictional problem, which again I think sort of merges with the merits, and this is the sort of cajole, coerce language that Your Honor mentioned from Tarani. Look, if the government is going to a social media platform or another third party and saying, you know, do this or we're going to punish you or, you know, to take the flip side, we'll give you a million dollars or some other very valuable benefit to do this. You know, that's the sort of situation where it's possible that the government can be held to be responsible for the action that the third party ultimately takes. That's also the sort of situation where you have an Article III grievance between the alleged ultimate victim of that pressure and the government as opposed to the third party. But where all that's happened is that the government has made some statements about public policy where it's encouraged a company to act in a certain way as President Kennedy did with the steel companies or President Eisenhower with the newspapers. I mean, those questions I think are valuable because... Roosevelt, I think. Roosevelt, I'm sorry. He has a long history and an important one of presidents and their senior officials being able to speak to members of the American public, including American companies, about how to respond to what the executive branch perceives as threats, as potential harms. And that's really what is all that is alleged here. And to say then that that becomes, you know, unconstitutional coercion because there is some broader sort of overlay of government regulation, that there are things hypothetically that the government could do to the steel mills or the newspapers or the social media companies, that it becomes unconstitutional. Would it make a difference if, for example, you had a very important permit pending right then before the FTC? That sort of thing? I mean, is it just a matter of degree or is there any way of drawing that line? Because if there is any possibility of a lawsuit here, if it's not a bright line, then don't you have a question about wink, wink, nod, nod as opposed to, you know, that you have to have an overt threat. That's my real concern here is how should we write it if we were to take your side so as to not say that the government can never be sued for being coercive? Sure. And look, the Supreme Court has recognized and other courts have recognized it doesn't always have to be exactly an overt or explicit threat. I mean, Bantam Books, you know, the Rhode Island Commission on Obscenity visited the book distributors and said, here are some publications, some particular publications we've determined to be obscene. You know, we remind you of our obligation to recommend prosecution for obscenity. We're going to send a police officer to follow up. Right? That wasn't an explicit threat, but that all added up to something pretty darn close to an explicit threat. So we're not suggesting that that was wrong. But in order for a suit like this to go forward, you have to have pleaded in the complaint a plausible, specific basis to think that that sort of threat happened. And there's just nothing remotely approximating that here. What you have are a series of very general statements about public policy, that the government perceives some statements on social media to be false, perceives those falsehoods in there. Well, let's talk more about this. I know what an RFP is. That's an official government proposal. Is there statutory authority for this thing called an RFI? I don't, I'm not aware of any. Something they made up on the fly. Well, I'm not aware of specific statutory authority for an RFI, Your Honor, but it's not necessary because it's a purely voluntary solicitation. He's writing a letter saying, I mean, that's what they did with the sort of Title IX and the famous Dear Colleague letter. So that, I think, is closer to sort of actual regulation. That was, in the case of guidance like that, the question is sort of is it legally binding or is it just a strong suggestion? This wasn't even anything close to that. All that happened in the RFI was that the Surgeon General invited people, if they were interested, to send him information that he could use to form a broader picture of sort of the public health consequences of misinformation during the pandemic. And so he got that information. He looked at it. He published online, you know, as of a few months ago. But that's, nothing in there was sort of regulation either formally or informally, even approximating something like the Title IX guidance. What about the proposed amended complaint? If we look at that, I know it wasn't, was there enough in there? No, Your Honor, there wasn't enough in there. I mean, the only thing that changed in the proposed amended complaint, as I recall, they wanted to amend to address some information that had just become public about a disinformation governance board that the Department of Homeland Security had formed and that it had subsequently disbanded. And so they wanted to add some allegations about that and add the Department of Homeland Security and some other defendants. And as I recall, maybe one more plaintiff, too. But there was nothing in there that came close to substantiating their theory that there was some specific threat made by any of the defendants to cause Twitter to act as it did. And, of course, they haven't appealed the denial of the motion for leave to amend, which was, you know, jurisdictionally improper and the rest. Unless there are further questions from the Court, let me just briefly, I mean, the Article III inquiry is especially important in a case like this. As the Supreme Court has said, the jurisdictional inquiry is especially rigorous where a federal court is asked to pass on the constitutionality of actions by a coordinate branch of government. And this case where, you know, case over Twitter's application of a policy predating the alleged pressure campaign brought by plaintiffs who are now apparently free to post as they want would be, I think, an exceptionally unfit vehicle for the Court to address. Can you say anything? We've really been talking about the causation side. Can you talk about the redressability side? Sure. And I think, Your Honor, it's frankly a flip side of causations. I mean, basically what they have asked for in their complaint in their PI motion is a very broadly worded injunction saying, you know, the defendants shouldn't sort of try to pressure Twitter in the way that has happened. I mean, there are lots of broader problems with an injunction like that one, which, you know, aren't currently before the Court. But setting all that aside, I mean, the theory that an injunction like that could redress some injury they've suffered when Twitter is already, you know, has already stopped enforcing any COVID misinformation policy at all, I think is yet another reason to hold that there's no jurisdiction over this suit. In terms of, at least on its face, such an injunction wouldn't make Twitter, and let's pass the question of whether Twitter has already changed its policies, but if this Court told the government to quit talking, that wouldn't make Twitter change its policy, would it? No, Your Honor. That's what I'm saying. It seems like, A, it's potentially not redressable, although, but on the other hand, telling the government to quit making threats doesn't mean that the government can't take action against you. Yeah, I mean, I think, Your Honor, Your Honor's question points to why I think this is all sort of two sides of the same coin, which is, from the face of the complaint, Twitter's action here was voluntary. It was independent of the government. So both that didn't cause the injuries plaintiffs are complaining about, and it's not redressable by an injunction against the government. Both before and after such an injunction, Twitter's going to act as it wants to do, and it's going to set the policy it wants to set. And, look, that is the reason I keep mentioning the fact that they're not enforcing any COVID misinformation policy today is I think it highlights probably better than anything the fact that Twitter is not acting under coercion from the government. It is independently setting its policy on these subjects. Unless the Court has further questions, we'd ask that the District Court's judgment be affirmed. Thank you, Counsel. Very quickly, as to the where's the line drawing, there is an amicus brief by Volokh, by Professor Volokh about how line drawing is done in the employer context. I think that that could be adopted. But I really, I agree on Tarani. The FBI agent did ask questions, but he asked questions in his lane of things that the government would normally be doing. In Schlissel, it's a mistake. It's only cited on page six and seven of the reply, Your Honor. But I think that this is not a summary judgment. This is not an appeal of a PI. All these facts that have been determined just show that the inferences were not given to the plaintiff in this case because this was a motion to dismiss. And the inferences have to go to the plaintiff. And they were not here because everyone's saying, well, look at the timeline. Well, we pled that yes, because Twitter did do things. It started doing them in March. You can take judicial notice that the administration's changed in January of that year. What's the inference? What's the inference that no one was thrown off Twitter? None of my people, none of my, the appellants here said, you are banned forever from Twitter until the government started putting pressure on Twitter. So is that when you use the word ramp-up enforcement and your adversaries seem to push back against that? Is it this permanent ban that's a ramp-up? Yes, Your Honor. Certainly the inference of that is that, and what did Jen Psaki say? She says they're not doing enough, right? They gave someone a 12-hour ban. What's the date of this, of the throwing off and ramp-ups? Certainly by May. May, Psaki and the President start saying things. May of 2021. And I think Murthy is June of 2021. And then seven days after the Surgeon General, who's totally out of his... Factual or inferential disagreement here, I'm just trying to spell it out, is June of 2021 is when you're saying really bad stuff happened. Your adversary was saying, oh, the bad stuff happened in March, and that was before the May statements. Right, and nobody was banned before the government started talking. If you look at this... If we look at the record or the complaint, it's the June banning that you're making the timeline. And May, and Psaki saying, you're not doing enough. May's Psaki statement was asking, what happened to you? And that's, you're saying, in June was a permanent ban. It's true. It happened after June of 2021, a permanent ban started. But Psaki said, you're not doing enough. So whatever Twitty was doing in March and before that, she was saying they weren't doing enough. So I think that makes this different. There has been some attempt to analogize this to the antitrust context, the Twomley case, where you have parallel conduct of two different companies, and you've got to allege more to have a plausible conspiracy. And I think the argument is you've got to allege more here of some agreement between the government and Twitter to oppress your client, other than the fact that they both were doing things independently of each other. I mean, how do you respond to that? So first of all, the allegations about what the government was doing and the timeline of what Twitter was doing are far more specific in this case than they were in Twomley. Twomley was a bare bones antitrust, oh, they did this, and they are all together in it. The other thing about Twomley is all those companies had an economic incentive to get together and raise prices. That's what antitrust is. The reason we have antitrust is everybody who's, you know, it's Adam Smith, the butcher, the baker, they either do things for their own reason or when they're together they conspire against the public to raise prices. That's why we have it. Here, Twitter has every incentive to let people on their platform. That's how they make money. They don't throw people off the platform permanently. That is economically damaging to them. So once again, the inference is they're not doing it for economic reasons because it's against the entire business model of any social media that is driven by how many people are engaged with it. In antitrust, yes, everyone has an incentive under antitrust to collude with one another. So you have to plead more. But here, all of the economic factors go against Twitter doing this. And that's why the inference is that the government did it. Okay. Any other questions? Okay. Well, thank you, counsel. We'll take the case under submission.